FANNIE J. COLLENTINE, Appellee, v. E. L. JOHNSON, Appellant, et al., Appellees.

PRINCIPAL AND AGENT: Undisclosed Principal—Liability. One
1 who, through a broker with whom land is listed for sale, and without the knowledge of the owner of the land, secretly arranges to buy the land, and obligates himself to pay the purchase price thereof, and who, through said broker, causes an impecunious and fictitious buyer to enter into the contract of purchase and to execute the notes and mortgage and to become the grantee in the deed of conveyance, and who receives from the said fictitious buyer an assignment of the said contract and a deed under which he assumes no personal liability on the mortgage debt, will, nevertheless, be held personally liable to the actual vendor for the full purchase price *as an undisclosed principal;* and if the agent goes beyond the scope of his authority in negotiating the said contract, the undisclosed principal may not complain, if, with full knowledge of the terms of said contract, and before parting with anything of value, he appropriates to himself the full benefits of the contract.

FAVILLE and ALBERT, JJ., dissent.

MORTGAGES: Assumption by Subsequent Vendee—Right to Cancel. 2 Principle reaffirmed that the assumption by a vendee of payment of an outstanding mortgage on the land may be canceled prior to the time the holder of the mortgage has knowledge of such assumption.

MORTGAGES: Foreclosure—Nonprejudicial Judgment. In the foreclosure of a second mortgage, a defendant who is personally liable for taxes paid and interest advanced by plaintiff, to protect the property and to prevent a foreclosure of the prior mortgage, may not complain that the court rendered judgment *in rem* for the amount of said interest and taxes, instead of entering a personal judgment therefor against complainant.

Headnote 1: 2 C. J. p. 840. Headnote 2: 27 Cyc. p. 1360. Headnote 3: 27 Cyc. p. 1767.

Headnote 2: 19 R. C. L. 377.

*Appeal from Floyd District Court.*—C. H. KELLEY, Judge.

MARCH 17, 1925.

SUPPLEMENTAL OPINION APRIL 9, 1926.

REHEARING DENIED FEBRUARY 16, 1927.

Suit in equity, to foreclose a purchase-money mortgage. The defendant P. H. Bestor was the purported purchaser and mortgagor. It is averred in the petition that the actual purchaser was the defendant E. L. Johnson, against whom personal judgment is prayed. A decree was entered in the district court as prayed. The defendant Johnson has appealed.—*Affirmed.*

*Pike, Sias, Zimmerman & Frank,* for appellant.

*W. H. Salisbury* and *H. J. Fitzgerald,* for plaintiff, appellee.

*Graven & Graven,* for defendants, appellees.

EVANS, J.—I. On and prior to April 30, 1919, the plaintiff and her husband (since deceased) were the owners of a 197-acre farm, situated in Floyd County. On or about the same date,

1. PRINCIPAL AND AGENT: undisclosed principal: liability.

they listed the same for sale with one Soesbe, a banker and real-estate agent. On April 30, 1919, Soesbe obtained their signature to a con-

tract which amounted to an offer of sale, if accepted within 10 days. The proposed purchaser named in the contract was P. H. Bestor, defendant herein. Bestor was not, in fact, the proposed purchaser-to-be. He was an employee of Soesbe's, and his name was occasionally used by Soesbe, with his consent, as a so-called "straw man." Soesbe had in contemplation an arrangement with the defendant Johnson, and was, at or about this time, carrying on negotiations with Johnson for the acquisition of this farm, whereby Johnson should become the purchaser of the farm, and should furnish the funds therefor, and whereby Soesbe himself should take a one-half interest in the contract of purchase, and put his own time and efforts in handling the transaction against the funds actually invested by Johnson. Such arrangement was actually entered into between Soesbe and Johnson, first orally and then in writing, before plaintiff's written offer was accepted. On May 10, 1919, Soesbe caused the acceptance to be made in the name of Bestor, and Bestor signed the contract accordingly. Immediately thereafter, on May 12th, Bestor assigned the contract to Johnson. The assignment executed by Bestor assumed to charge Johnson with the performance of all the obligations of the contract, including the payment of the purchase price. Under this contract, the purchase price was $37,922.50, of which $1,000 was to be paid down, with the execution of the contract, and $4,000 was to be paid on March 1, 1920. The balance of the purchase price was to run for 10 years, at 5 per cent annual interest. The vendors were never informed of Johnson's interest in the purchase. On February 28th following, they conveyed the property by warranty deed to Bestor, and Bestor conveyed to Johnson. Johnson paid the installment of $1,000 at the time of the execution of the contract, and paid the further installment of $4,000 at the time of execution of the deed. The balance of the purchase price was separated into two mortgages: a first mortgage of $15,000, and a second mortgage of $17,922.50. These were executed by Bestor. The first mortgage was negotiated. This suit was brought as a foreclosure of the second mortgage. After a conveyance to Bestor by the vendors, Bestor executed a deed to Johnson, by the terms of which Johnson assumed the payment of the mortgages, and mailed the same to Johnson at Waterloo. Thereupon, Johnson objected to the

assumption clause, and returned the deed, with the assertion that, by his understanding with Soesbe, he was not to be personally liable for the mortgages. He therefore asked that another deed be executed, wherefrom such clause should be omitted. His claim in this respect was conceded by Bestor, and another deed was executed and sent to him, in the form desired by him. The understanding between Soesbe and Johnson was in the first instance oral, and was reduced to writing and duly signed by both parties on May 5, 1919. It is undisputed that Johnson insisted that his name should not be known in the transaction. It was also agreed between him and Soesbe that this could be accomplished by the use of the name of Bestor as a "straw man." While much emphasis is laid by the plaintiff upon this circumstance, as amounting to a fraudulent conspiracy, it is to be said that it was not necessarily such. There were legitimate reasons for Johnson's desire that his name should not appear in the transaction. He was a banker; and was not engaged in the real-estate business. He was not a borrower. The appearance of his name upon the public records as a mortgagor of property might easily be misunderstood, and its significance might be readily distorted. Such a course on his part would not necessarily operate as a fraud against the plaintiff, provided that he had thereafter consistently maintained the relation thus assumed by him, and had performed the legal obligations that arose out of his relation. However, his repudiation of his relation to the transaction presents a quite different question.

The theory of recovery sustained by the trial court was that Johnson was an undisclosed principal in the transaction; that Soesbe was his agent, as such; that they were the only parties in interest in the transaction; that Soesbe's interest was also undisclosed; that Bestor had no interest therein, but lent himself as a mere mask to conceal the identity of the real parties in interest. Soesbe was not made a party defendant; so that the question of his liability, if any, either to the plaintiff or to Johnson, is not involved herein.

The theory of defense presented by counsel for the appellant, Johnson, is that he was not *in* or *of* the original transaction; that Soesbe and Bestor had acquired the farm from plaintiff before he became interested therein; that the written contract between him and Soesbe, dated May 5, 1919, was not

signed by him until May 20th, which was 10 days after the contract of purchase from the plaintiff was made; that, therefore, he was a mere subsequent vendee, who was liable only to his own vendor, and to the extent of his contract with his own vendor.

It will be noted, therefore, that the pivot of the case upon which the result must turn is a question of fact, viz: Was there an understanding between Johnson and Soesbe, oral or written, prior to May 10, 1919, that he was to be the purchaser; or did his relation to the transaction have its origin after May 10, 1919? The evidence of Soesbe is that the oral understanding between him and Johnson had been reached before he accepted the contract on May 10th. The contract of May 5, 1919, was as follows:

"This agreement made this 5th day of May, 1919, between E. L. Johnson, Waterloo, Iowa, party of the first part, and C. W. Soesbe of Greene, Iowa, party of the second part, witnesseth:

"That whereas, party of the first part *is purchasing and taking a deed* to the following described premises, namely, the west half of the northeast quarter and the southeast quarter of the northwest quarter and the north half of the northwest quarter, except railway right of way, of Section Number twenty-two (22) in Township Number ninety-five (95) north, of Range Number Twenty-six (26) west of the 5th P. M. in Floyd County, *for which he is paying $192.50* per acre for 197 acres, of which $1,000.00 has been paid down as earnest money, and $4,000.00 is to be paid down on March 1st, 1920, and the balance of $32,922.50 is to run ten years at 5 per cent with option to pay any part thereof on any interest day. The party of the second part, having received a commission of $2.50 per acre of the 197 acres amounting to $492.50, which has been deducted from the payment of $1,000.00 paid as earnest money, the total sum to be paid by the first party shall be the net sum or $4,507.50.

"Whereas, it is desired by the parties hereto to enter into an agreement regarding the sale of said land and provide compensation to said second party for the selling of the same.

"Now, therefore, it is hereby mutually agreed that party of the first part does hereby give and grant to party of the second part, the exclusive right to sell said premises for and during

a period of two (2) years from the date hereof, provided that said land shall not be sold at a less price than twenty-five ($25.00) dollars per acre over and above the cost of said lands to party of the first part and that in the event that said lands are not sold within said two years' period, then at the end of said period, the same shall be put up for sale, at public auction, and sold unless otherwise mutually agreed upon. It is further agreed that party of the first part will advance such money as may be necessary to pay all taxes and assessments and insurance, such buildings and improvements, if any, to be mutually agreed upon by the parties hereto. It is further agreed that party of the second part shall have the right to enter into leases with responsible parties for said land or part thereof at a rental of not less than ($8.00) eight dollars per acre, and such leases to extend not longer than March 1st, 1922, unless otherwise mutually agreed by the parties hereto, and it is the duty of second party to keep said lands leased to responsible parties. Party of the second part agrees to give his time and attention to the care and to the sale of said premises and to use his best efforts and good faith in the carrying out of this agreement, and that no charge shall be made or compensation asked or claimed for his time or efforts under this agreement other than is specifically set forth herein, and that no charge shall be made by him for any commissions in connection with the purchase or in connection with the sale of said lands, or in connection with the lease or collection of the rent. It is further agreed that all income and receipts from the said premises shall be paid over to the party of the first part as collected and due account of the same kept by him, and that upon the sale of said premises, there shall be added to the purchase price of said lands, all moneys advanced by party of the first part for taxes, assessments, insurance, buildings, improvements or other proper expenses in connection with said lands, and there shall be computed upon and added to the said amount, interest at the rate of eight (8) per cent per annum, payable annually, and that said total amount and interest shall be deducted from the selling price of said lands plus all moneys received as income and profits from the same, and that the balance so remaining shall thereupon be divided equally between the parties hereto, the said one half such balance so found to be in full compensation to party of the second part

for his care, attention and services rendered under this contract or in connection with the said lands. In the event of the death of the party of the second part before the expiration of this agreement, then the authority to sell and to manage said lands, to him herein granted, shall cease, and such authority shall revert to the party of the first part, his heirs and assigns, and upon the sale of the said premises in accordance with this contract the share which would be due said party of the second part hereunder shall be paid over, when determined, as above set forth, to the legal representatives of the party of the second part.

"It is further understood and agreed by the parties hereto that in case sale of said lands shall be made at a loss computing the same, as above set forth, that party *of the second part. does hereby agree to share one half of the said loss and pay the same to party of the first* part as soon as the amount thereof is determined.

"In witness whereof we have hereunto set our hands the day first above written.

"C. W. Soesbe

"E. L. Johnson

"Witness:

"K. L. Walsh."

Counsel for appellant contends that this contract was not signed by Johnson until May 20th. This contention of fact is a matter of inference, predicated upon a letter written by Johnson on May 20th, wherein he purported to return a copy of this contract to Soesbe. Such letter was as follows:

"Waterloo, Iowa

"May 20th, 1919.

"Mr. C. W. Soesbe,

"Greene, Iowa

"Enclosed is my check for $507.50 together with one copy of the contract which you sent signed by me, covering the deal for the M. C. Collentine farm of 197 acres, contracted to P. H. Bestor and assigned by Bestor to me. I understand that the mortgage will be given by Bestor and he will deed to me and I will not be obligated under this mortgage nor my name appear. I hope that an early sale can be made. This certainly seems to

be a great year to sell land. Walter handed me these papers on his return and I trust *the delay* has not inconvenienced you.

"ELJ:M                                            E. L. Johnson

"Enclosure.

"By error contract is locked up but here is check anyway."

The person referred to in the foregoing letter as "Walter" was the brother of Johnson, who had represented him to some extent in the transaction. Two days later, Johnson wrote the following letter:

"Waterloo, Iowa
"May 22nd, 1919.

"Mr. C. W. Soesbe,

"Greene, Iowa

"Enclosed is one copy of the contract in regard to the Collentine land and the Bestor contract in regard to it for which I sent you check for $507.50 the other day. I regret the matter *has been delayed* and that the contract was not earlier in its return. I notice the advance in the price of lands in the western part of the state. There ought to be something in this in an early turn over.

"E. L. Johnson

"ELJ:M"

The inference which counsel draws from the foregoing letters is that the date of the first letter must represent the time of the signing of the contract of May 5th. Soesbe and Bestor testified that they could not be sure of the exact date of the signing by Johnson. As against this, Soesbe's evidence is undisputed that the oral arrangement between him and Johnson was made prior to May 10th. This of itself would have been sufficient, even though it had never been put in writing. Moreover, in the letters referred to, Johnson excuses his "delay." This of itself indicates that the return of the contract was due at an earlier date. Furthermore, counsel has quite overlooked the testimony of Johnson himself. As a witness, he identified the contract as follows:

"This is the contract I made with Mr. Soesbe on the 5th day of May, 1919, in reference to the purchase of said land,—these three sheets."

He also testified:

"After this arrangement between Mr. Soesbe and myself was entered into, and I was to pay the money to secure it, I saw that contract that he procured from Collentines for this land, which was shown to me to show what the deal was, and as the matter was going through that we had talked, and that the thing had been done."

He did not testify that he signed the contract on any other date than on May 5th. The contract of May 5th incorporated the very terms of sale in accordance with the written offer of vendors of April 30th. So, by this contract, Johnson bound himself to the purchase, while the property was still owned by the Collentines.

It must be said, therefore, that the important premise of fact upon which the argument of the appellant is predicated, fails, and that appellant must be deemed to have entered fully into the transaction prior to May 10th.

It will be noted also from the contract of May 5th that Johnson expressly acknowledges his promise to pay for the land at $192.50 per acre. This was the exact price to be received by the then owners. The rule of law contended for by appellant being accepted,—that, in order to hold an undisclosed principal to the terms of contract made by his alleged agent, the authority of the agent, as such, and the scope of his agency, as well, must be proved,—such proof is complete in the contract of May 5th. Furthermore, the fact that the appellant received the full benefit of the contract pursuant to its terms, with full knowledge of the facts pertaining to the transaction, is proof, both of the agency and of the scope of it.

Still further evidence is found in the fact that, in the assignment of the contract made by Bestor, immediately upon the execution thereof, it was stipulated that Johnson assumed all the obligations thereof. No objection was made by Johnson to this clause at that time, though he did object thereto one year later. This promise, however, added nothing to the obligations which he had already acknowledged in the contract of May 5th. Some stress is laid by appellee upon this assumption clause in the assignment of the contract, to the effect that this alone created a liability. We do not hold liability upon such ground.

2. MORTGAGES: assumption by subsequent vendee: right to cancel.

It was open to the appellant to contradict this provision by oral evidence. It was also open to him to obtain release therefrom by the consent of Soesbe and Bestor, provided it was done before knowledge thereof came to the Collentines. He did obtain release therefrom from Soesbe and Bestor, one year later, and before any knowledge thereof had come to the Collentines.

His liability in this case rests, not upon the fact that, as a subsequent vendee, he voluntarily assumed payment of the incumbrance, but upon the fact that he was the real party in interest in the original transaction, and that, as such, he was liable for the purchase-money mortgage only because it was a part of such original transaction. The significance of the contract of May 5th is not that it created a *cause of action* against appellant in favor of plaintiff, but that it was *evidence* of the relation which the appellant actually sustained to the original transaction. And such is the only significance which we attach to the assumption clause contained in Bestor's assignment of the contract. This disposes of the argument by counsel pro and con, on the subject of the liability created by such assumption clause. On this general subject, our attitude is indicated in *Shult v. Doyle*, 200 Iowa 1.

It may be noted further that we are not concerned in this case with the question of mutual obligations assumed, as between Johnson and Soesbe. It being proved that Johnson was the undisclosed principal in the transaction, no agreement between him and his agent or agents which was calculated to protect him as against liability, and which does not negative his character as principal, can avail him as against the plaintiff. For the performance of such agreements, if any, he must look to the parties who made them.

II. It appears that the plaintiff, as holder of the second mortgage, was compelled to pay certain installments of interest upon the $15,000 mortgage, and was likewise compelled to pay

3. MORTGAGES: foreclosure: nonprejudicial judgment.    certain installments of taxes, to a total amount of more than $1,000. She prayed recovery of such amount from the defendant. The trial court, apparently out of an abundance of caution, refused to enter personal judgment against Johnson for such amount, but did enter judgment *in rem* against the property, and ordered that it be first paid out of the proceeds of execution sale. The

necessary effect of this would be to increase by that much the deficiency judgment, if any; and the appellant complains of this feature of the judgment. The argument is that, at most, the plaintiff was entitled only to prorate the amount thus paid, with the amount of her mortgage, in the application of proceeds of sale.

We are unable to see any reason why personal judgment should not have been entered against the appellant for such amount. He was as much liable for the first mortgage as for the second. And this is likewise true as to the taxes. The contract of sale and the contract of May 5th expressly provided that he should pay the taxes. If the plaintiff had not paid them, they would be a prior charge upon the property. If she was compelled to pay them, to protect the property against a sale for taxes or against a foreclosure of the first mortgage, such payment operated *pro tanto* to the benefit of the appellant, and to his protection against further damage and loss. The order of the court worked no wrong to the appellant. It simply preserved—perhaps restored—a *status quo*.

Upon the record before us, we see no ground for disturbing the decree of the trial court in any respect. It is, accordingly, affirmed.—*Affirmed*.

FAVILLE, C. J., and ARTHUR and ALBERT, JJ., concur.

### SUPPLEMENTAL OPINION.

EVANS, J.—I. Appellant filed petition for rehearing. He also filed an application for a hearing thereon by the full bench, and this application was granted. The argument on petition for rehearing has been directed broadly to the proposition that our former opinion was a clear departure from the former state of the law, and was therefore revolutionary; and more particularly to the proposition that the liability adjudged against the appellant goes beyond the scope of the authority of the agent, Soesbe. That question was discussed in detail in our opinion filed, and the written evidence of the scope of Soesbe's authority was incorporated in such opinion. We adhere to the pronouncement there made, and are not disposed to repeat the discussion.

We deem it proper, however, to respond to the petition and argument thereon with a few general observations on the doc-

trine of liability of an undisclosed principal. This doctrine, though unequivocally established by authority, is in its nature somewhat anomalous, in that it carries a seeming contradiction to other well established principles. That a person undisclosed and unknown at the time the contract was made should later be deemed a party to such contract, and be bound thereby, seems to run counter to the elementary rule that a contract is binding only upon the parties who entered into it, and only in accordance with its actual terms; and that such terms, ordinarily and almost of necessity, disclose the parties thereto. The doctrine, however, though anomalous, is well founded, and has its appropriate function. From its very nature it is one which does not find frequent application. Men do not ordinarily contract with undisclosed contracting parties. If the agent of an undisclosed principal purports to enter into the contract in his own behalf, and thereafter *performs* the contract, then the disclosure of his principal becomes immaterial and of no interest to the other contracting party. The doctrine usually comes into its function only when necessary for the protection of the other contracting party against a wrong which he would otherwise suffer. The doctrine is a product of judicial invention, and its function is both to prevent a fraud, on the one hand, and on the other hand to enable the enforcement of liability against the undisclosed principal, without imputing fraud to him. The case at bar furnishes a good illustration of its operation, its limitation, and its peculiar relation to the subject of fraud. The petition charged liability against the appellant on two alternative grounds:

(1)   That he was an undisclosed principal.

(2)   That he entered into fraudulent collusion with the plaintiff's then agent, Soesbe, whereby the plaintiff was betrayed and deceived by Soesbe, and was induced thereby to convey a farm to a ''straw man,'' who was wholly without interest in the transaction, and who was financially irresponsible. These alternatives tend to negative each other. If, by entering into the contract of May 5, 1919, with Soesbe, agent of the plaintiff, the defendant intended to assume the relation and legal obligation of an undisclosed principal in the transaction, then his conduct was not inconsistent with honesty of purpose. The very obligation implied by law, and necessarily assumed by the defend-

ant, as an undisclosed principal, operated to protect the plain-tiff, as vendor, against any *injury*, and therefore to repel the inference of fraud which might otherwise arise, upon the face of the transaction. In other words, the concealment of his identity by the defendant as a proposed purchaser could be consistent with honesty, unless it operated to the injury of the plaintiff, and was intended so to do. On the other hand, if the purpose of the concealment was to avoid payment of the pur-chase price, except so far as it could be realized out of the property itself, and to enable the defendant to acquire the property through the medium of an irresponsible "straw man" (Bestor), then the transaction would take on a sinister char-acter; and would become an actionable fraud, if injury resulted therefrom to the plaintiff. Soesbe was the agent of plaintiff. He had contracted for, and afterwards collected, his commission of $2.50 an acre. He represented to her that he had a good and responsible buyer. This was literally true. The buyer was the defendant. All these things the defendant knew at the time he entered into the contract of May 5th. The purpose to use Bestor as a "mask" was mutual, as between the defendant and Soesbe, and was consented to by Bestor, who was a mere em-ployee of Soesbe's. If we say that the defendant was not as-suming the relation of an undisclosed principal to the trans-action, then we should have to say, also, that both he and Soesbe had committed a flagrant fraud upon the plaintiff. In such event, the contract of May 5th became one of purchase and sale of the plaintiff's agent, and was necessarily corrupt.

We have exonerated the defendant from fraudulent pur-pose. There is no ground in this record upon which such exon-eration may be consistently based, except that he stood in the relation of an undisclosed principal, and, since he was thereby liable for the full purchase price, the contract of May 5th worked no injury to the plaintiff. We may well assume that the adjudication of liability of the defendant on this ground is more favorable to him than the adoption of the other alter-native. His defense that the agent acted beyond the scope of his authority has been discussed in the original opinion. The contract procured by Soesbe from the plaintiff was anticipated and recited in the contract of May 5th with the defendant. After the execution of the contract by plaintiff, it was assigned

and delivered to the defendant. He therefore knew all its terms before he had accepted its benefits, and before he had paid a dollar thereon. If the contract went beyond the scope of Soesbe's authority, the defendant then had the right and the oppor-. tunity to repudiate it, and thereby to refuse both its obligations. and its benefits. He did not do so. He took the full benefit thereof, and, pursuant thereto, accepted a conveyance of the property on March 1st. Having accepted the benefit of the contract, with full knowledge of all its terms, he cannot *thereafter*, as against the plaintiff, repudiate the authority of his agent by a mere showing of subsequent communications that passed between him and the agent. The question of whether the liability of the defendant is to be predicated upon notes given by Bestor, or only upon the contract of purchase, is not in the case.

The former opinion is adhered to, and the petition for rehearing must be overruled.

DE GRAFF, C. J., and STEVENS, VERMILION, and MORLING, JJ., concur.

FAVILLE and ALBERT, JJ., dissent.

FAVILLE, J. (dissenting).—I must confess that I am not free from doubt in this case. I concurred in the opinion as originally filed, but on rehearing I am very much in doubt as to the correctness of the original opinion. The supplemental opinion does not altogether answer the troubles that confront me.

We are committed in this state to the doctrine of an undisclosed principal. All of the courts of the country and all of the text-writers recognize the doctrine as being an anomaly, and wholly inconsistent with the general principles of the law of contract. It has been engrafted on the law by virtue of necessity, to effectuate justice. I am willing to concede that the doctrine has been recognized and is in force in this state. We have so declared a number of times, and I am not disposed to dispute the proposition now.

But granted that we recognize the anomalous theory that one may be bound by a contract to which he is not a party, our cases predicate the right of recovery solely on the theory

of *agency*.. In other words, the party is bound because he is the undisclosed principal to a contract procured in his behalf *by his duly authorized agent.* Not all of the courts base the right of action upon this ground, but we are committed to it.

Therefore, we have a situation where, in this instance, Collentine is claiming the right to hold Johnson on a contract because it is claimed that the contract was made by Johnson, through his agent. Collentine never heard of Johnson at all in connection with the matter. He sold his land to Bestor. Soesbe brought Collentine and Bestor together. Collentine never heard of Johnson in the deal, and was content and satisfied to make his contract with Bestor; to receive the down payment that was made, and to take a mortgage upon the land for the deferred payments. This was Collentine's contract.

It is suggested in the supplemental opinion that Soesbe, and even Johnson, might be liable for fraud, because of misrepresentations made to Collentine by Soesbe in connection with the deal. The only fraud that could possibly be made the basis of recovery, as I read the record, would be the representations that Bestor was good financially, when in fact he was insolvent. There is no evidence whatever that Johnson knew that Soesbe made any such representations, and not a suggestion of evidence that, even if he knew that Soesbe made them, he authorized him to make them, or entered into any conspiracy with Soesbe that they should be made. Therefore, the suggestion that an action at law for deceit might lie against Johnson, on the theory of a conspiracy with Soesbe to deceive Collentine regarding the financial standing of Bestor, is quite by the mark. If Collentine has any such action, he has never suggested it in this case. This is a suit in equity, to foreclose a mortgage upon real estate, and for recovery on certain promissory notes, with interest and attorneys' fees, as provided in the notes. No claim of a vendor's lien is asserted. It is simply an attempt to hold Johnson, as though he had assumed and agreed to pay a mortgage which he in fact did not assume and agree to pay. In fact, no recovery for the purchase price, as such, is sought. The action is to hold Johnson on Bestor's mortgage, according to its terms.

I will concede that, if Soesbe was Johnson's agent in buying the premises, Johnson, as an undisclosed principal, could be liable in so far as Soesbe had power and authority to bind him.

But I have yet to learn that any agent can bind his principal in the purchase of property by other and different terms than the principal authorized, where there is neither estoppel nor ratification involved.

There is no question, under the record, but that Johnson expressly limited the authority of Soesbe, in purchasing the land from Collentine. He agreed to make the down payment in cash, and this he did. He never agreed, directly or indirectly, in any way, to make any further payments on the land. The land itself was to stand as security for the deferred payments. This was his agreement—a common one. Collentine never dreamed of a personal liability on the part of Johnson. He sold the land with a down payment and security on the land for the deferred payments. The only authority in the world that Soesbe had from Johnson was to buy the land on the express terms that Johnson would make the down payment, and assume no personal liability for the deferred payments, but that the land itself should stand as security for the deferred payments. The undisputed record shows this, and that Johnson absolutely refused to accept the deed from Bestor until it was drawn so as to express the original authority which he granted to Soesbe,—that he should not be personally liable.

We therefore have a simple situation by which the seller, Collentine, is seeking to hold a man with whom he never made any contract whatever, whom he never heard of in connection with the deal, who he never dreamed was in existence, to a personal liability to pay a debt which the other man never agreed to pay, and which he positively and unequivocally prohibited his agent from contracting in his behalf.

I am willing to go the one step, and hold that a seller may recover against an undisclosed principal, even though he did not have a direct contract with him. Such a holding is unscientific, illogical, and properly recognized as "an anomaly" in the law; it is making a contract for parties without any semblance of a meeting of the minds of those parties. But we have recognized it.

But when we have gone that far, I think we should stop; and I cannot see how we can hold this undisclosed principal in a contract purporting to have been made by his agent which is directly contrary to the express authority given to the agent.

This is not a case of holding one out as an agent, because Collentine never heard of Johnson. It is not a case of estoppel; for Collentine never acted in any way on any assumption that Johnson was connected with the deal. He sold his land to Bestor, and not until after he had commenced this action did he ever dream of such a thing as that Johnson was connected with the deal in any way,—much less by contract with him.

Collentine got exactly all he contracted for. He sold his land to Bestor, and got his down payment and a mortgage back. If Bestor was insolvent, that was Collentine's lookout when he traded with him; and, if Soesbe deceived him about Bestor's financial situation, it may render Soesbe liable to Collentine for his false representations, but it does not bind Johnson, who knew nothing of these representations.

The result of the opinion is that we are making for Collentine a contract with a party he never heard of, and with whom he never attempted to make a contract at all, and, in addition, we are making a contract that was never authorized. We are binding Johnson to terms which his agent had no authority whatever to make, but which are in direct and positive violation of his absolute instructions.

I cannot bring myself to believe that we have a right to make a contract for parties who never made it between themselves, and, in addition to that, make the contract in direct and positive violation of the understanding and agreement of one of the parties thereto. This is more than a court of equity would do by way of reformation under its plenary power.

In addition to all of this, the action is brought to foreclose the mortgage, and for judgment on the notes given by Bestor, and for personal judgment thereon against Johnson; and recovery was sought and allowed at the rate of interest fixed in the notes, including an allowance for attorneys' fees. There was no semblance of authority to bind Johnson to anything of this kind, but I submit that it is consistent; for, if Soesbe had a right to violate his positive instructions and bind Johnson for personal liability for the deferred payments on the purchase price, I do not see why it is not consistent to hold that Soesbe could also bind him to pay attorneys' fees. Why could he not have made it all cash, as well? If we are not to limit Johnson's liability by what he authorized Soesbe to do as his agent, why

stop at interest· and attorneys' fees? `I· see no· place to· put the limit of Johnson's liability, under 'this holding. · If ·he could not limit it by positive· instructions to his agent, then I do not know where the bounds are to· be set.

·Suppose, to ·illustrate what I have in mind, we leave Bestor out of· the 'deal: entirely. ··Suppose Johnson had told Soesbe to buy the' land of ·Collentine at the agreed purchase price, on con- dition that' he pay so much down· payment, ·and that security be given for the balance on the land· only, with no personal liabil- ity on Johnson's part therefor. ·Suppose that, armed with ·this authority, Soesbe had gone to Collentine and purchased the land under' written contract,· which he signed as agent for Johnson, and in that ·written contract, instead of following Johnson's instructions and buying the land on a· down payment and secur- ity on the land for the balance, without personal liability, he had ·bound Johnson to· be personally liable for the purchase price. Suppose Collentine- had then sued Johnson on ·this contract, executed in his name and in his behalf by Soesbe, would we hold Johnson liable under such a contract? Certainly not. And ·why not? Simply because his agent exceeded his authority in making the contract, and therefore could not bind his principal to the unauthorized terms. But we are now holding that, where the· principal· is· undisclosed, he can· be bound in behalf of a· third party by his agent, to terms which· he never agreed to, and which he never authorized his agent to make.

We· started with *Thurston v. Mauro*, 1 G. Greene 231, recog- nizing that "recovery may be had from an undisclosed principal for goods sold to an agent acting within the scope of his author- ity." We followed the rule down to *Strohmeier v. Anderson*, 195 Iowa 828, but always reiterating, repeating, and emphasizing that, where the undisclosed principal is held, it must be be- cause of the act of his agent, "*acting within the scope of his authority.*" If we now cast this limitation to the winds, I am at a loss to know where we are to stop; and I fear that we are laying down a, rule by which an undisclosed principal may be held liable for unauthorized contracts made by an agent in direct violation of instructions, when such contracts could not be enforced or upheld if they were made directly for a disclosed principal.

If the plaintiff in this action has any remedy against Soesbe,

it is not disclosed in the pleadings in this case. If he has any remedy against Johnson, it is in no way within the issues of this action to foreclose a mortgage. The doors of the law courts are still open to him for any actionable fraud, conspiracy, or deceit against any party or parties who may be liable therefor. If Johnson is liable at all, it could only be for the purchase price, and not on the Bestor notes. If he is liable as a purchaser, it can be only on the terms under which he purchased; not on some other and wholly unauthorized terms.

I think a rehearing should be granted.

. ALBERT, J., joins in this dissent.