EMELOUS BOND et al., Appellees, v. SIMON O'DONNELL et al., Appellees; F. L. SHARON et al., Appellants.

APRIL 3, 1928.

*Arbuckle & Arbuckle* and *Frank Maher,* for appellants.

*Edwards, Longley, Ransier & Harris,* for appellees.

KINDIG, J.—Full recital of the facts alone can reveal the pivotal points involved. Historically, the events are:

Appellee Emelous Bond in 1919 owned 243 acres of land in Buchanan County, and during that year sold the same to Messrs. Fouts and McGill, bankers, of Independence. The consideration  named was $40,000, of which $1,000 was paid at the time, and the balance accrued as follows: $9,000 March 1, 1920, at which date the deed,

duly executed by appellee, was to be delivered to Fouts and McGill, in return for their note of $30,000, payable to appellee on a future day, and secured by a real estate mortgage on the premises.

Next in the order of occurrences was the resale of the farm by Sheehan, Rosier, and O'Brien to Simon O'Donnell, September 5, 1919, for $48,300, payable as follows: $1,500 in cash at the time; $8,500, March 1, 1920; $30,000 by the execution and delivery of a note in that amount, secured with a mortgage on the acreage; and $8,300 through a note secured by a second mortgage thereon. This last named contract was partially assigned September 12, 1919, in the succeeding language:

"Seneca, Ill., Sept. 12, 1919.

"For value received I hereby sell, assign and transfer and set over to J. J. McGuire, F. L. Sharon and G. F. Sharon an undivided one-half (½) interest in and to a certain real estate contract dated Sept. 5th, 1919 from J. F. Sheehan, et al. for 241½ acres in Buchanan County, Iowa.

"Simon O'Donnell."

J. J. McGuire was the president of a Buffalo Center bank, while Frank L. Sharon was the cashier thereof. They, together with Gerald F. Sharon, were associated in the purchase and sale of farm lands. These men owned five farms in Lynn County alone. Title (for convenience and other purposes, best known to them) was held generally in the name of Joseph Matson, while the Buchanan County property in question was finally taken and held in the name of Simon O'Donnell.

Some of the further facts preceding the ultimate consummation of this transaction before March 1, 1920, were: During the month of July, 1919, McGuire was in conversation with one P. J. Sheehan, brother of J. F. or Jack Sheehan, concerning the "Bond farm" (the land in question). Then, on August 1st, McGuire wrote P. J. Sheehan (J. F.'s brother) a letter regarding the "farm," including these sentences:

"I don't know just what day we will be down, as Frank [F. L. Sharon] is on a deal and when he gets through, we will go down, and I want to look at the 320 acres near Jack's place, and also the farm joining Jack's, which you said was owned by

a doctor, who would sell for the same price as he gave for it. I would prefer to keep the sale quiet on the 243 acres, as those fellows will think a new boom is on, and may get a little stiff on the price, and if we can buy 2 or 3 farms near there, and if they don't sell, we can depend on O'Donnell to look after them for us. We will look over Dubuque Co. while there. I know the 320 acres is rented, and if the man is a good farmer, we likely can take the land subject to lease. If we don't find the other two farms suitable, we will go to Wisconsin and look around. You can draw on me at Buffalo Center for the payment on Jack's place, and we will see about the tire deal when we get down there.''

McGuire, on the 31st of August, again wrote to P. J. Sheehan:

''I want you to make the best deal you can on that farm—that is, get me that $500 commission if you can or part of it, and the terms $1,500 cash and $8,500 Mch. 1st, and the second mortgage to run 5 years if possible, if that is too long make it 3 years, and the contract made to Simon O'Donnell of Seneca, Ill. who will move on the place. You can draw on me at Buffalo Center for the $1,500 and let me know by wire if that is satisfactory, and we will make the contract when I get down there, or Frank [Sharon] may go to look at some land in Dubuque Co., so he can stop on the way and make the contract while there.''

On receipt of the last named communication, the said P. J. Sheehan, as agent, in compliance with those instructions, bought the place (Jack's) from Rosier, Sheehan, and O'Brien for and on behalf of O'Donnell, McGuire, and the two Sharons. In further obedience to directions, the same representative, P. J. Sheehan, as agent aforesaid, drew a draft on his principals for the $1,500 down payment, which was paid by them in proportion to their interests in the adventure. Hence, P. J. Sheehan, in his representative capacity, entered into a written contract with Rosier, Sheehan, and O'Brien, embodying the terms of purchase, as stated. That was signed by J. F. Sheehan, G. L. Rosier, and R. J. O'Brien, as vendors, for themselves, but was executed by the vendees in this manner:

"Simon O'Donnell,
"By P. J. Sheehan.''

It appears that F. L. Sharon was away from home Friday, September 5th, and did not know that this transaction had been completed. So, on the following Monday, September 8th, he wrote to P. J. Sheehan, the agent aforesaid:

"Guess Joe [McGuire] told you to draw on us for the $1,500 payment on Jack's farm [the one in question] and wrote me to make a contract. I haven't enough dope on it to do so, but enclose a couple of our blanks and a sample form giving as much information as I can. You can make them and forward for our signature. Make two copies. I was to have gone down there last week to close it up but couldn't get away."

Inclosed in the same envelope was a sample form of contract to be used by the agent, indicating that the name of G. F. Sharon was to be used as purchaser. Parenthetically, it is to be noted that the agent had already closed the deal, naming Simon O'Donnell as purchaser. After this, on September 12th, it is to be remembered, O'Donnell assigned the interest above mentioned to J. J. McGuire, F. L. Sharon, and G. F. Sharon. Accordingly, on March 1, 1920, approximately six months after appellants, the Sharons, had acquired the assignment interests in the purchase contract, there was a meeting at Independence of the three sets of parties involved in the transaction, for the purpose of completing the final settlement. Present at this time were appellee Bond, and O'Brien, representing himself, Jack Sheehan, and Rosier, and in addition thereto was O'Donnell, acting for himself, McGuire, and the appellants, Sharons. Moreover, P. J. Sheehan was there, in behalf of the last named principals, appellee asserts; but appellants claim he did not represent them, it being their contention he was the agent of O'Brien, Rosier, and J. F. Sheehan.

However, it is consistent with the record to say that, on all former occasions, P. J. Sheehan was authorized to and did act for McGuire, O'Donnell, and the Sharons, and the result of his accomplishments on the event in question was approved and ratified by appellants later. Bond, one of the appellees, "had heard," but did not personally know, of the equities acquired by McGuire, O'Donnell, and the Sharons. Therefore, he was ready to make and deliver the "deed" to Fouts and McGill, in accordance with the original agreement; but O'Donnell and the

agent, P. J. Sheehan, requested that the "deed" be made to O'Donnell and the Sharons, for private reasons, not wishing to be known in the transaction; and after some argument, this was done. Objection to so doing was first made by Bond, because he considered Fouts and McGill financially responsible, but did not know of the responsibility of O'Donnell. Being assured, however, by O'Donnell and P. J. Sheehan, the agent, that the Sharons and McGuire, all bankers, were in the transaction, and were financially responsible, appellees finally yielded. At this juncture, appellee Emelous Bond testified:

"I absolutely relied upon the statements of Mr. Sheehan that McGuire and the two Sharons were the real purchasers of the property, and were financially able to pay the entire purchase price. Q. And I ask you whether or not you did rely on what Mr. O'Donnell told you about the reasons for doing the business of that association in the name of O'Donnell, and upon what he said about their financial ability to pay. A. Most assuredly I relied upon that. Mr. O'Donnell was the only one of the purchasing party who was present. I was given to understand that they were as much a part of the purchasing parties, just as much as though they signed on the paper. I understood that Sharons and McGuire were purchasing the land, in company with O'Donnell."

Thereupon, appellees conveyed their land to O'Donnell, and received from him the note for $30,000, secured by a mortgage on the real estate. Fouts and McGill were released from their obligation to accommodate appellants and their associates.

Upon the witness stand, F. L. Sharon said:

"I knew at the time that O'Donnell obtained title to the land, and when the contract for the title was made, the price that O'Donnell was to give. I knew at that time that O'Donnell actually executed the mortgage he did execute, and paid the money that he paid, and received a deed giving title to the land. I furnished a part of the money that O'Donnell actually paid at that time. I furnished one sixth of $10,000. I bought an interest in O'Donnell's contract in the fall before he got the deed. I paid one sixth of $1,500 in the fall of 1919. In the spring of 1920, when the title passed, I furnished one sixth of $8,500, O'Donnell furnished one half of it, Mr. McGuire furnished one sixth, and my brother, Gerald, furnished one sixth. The title to

the land was taken in the name of O'Donnell with my knowledge and consent. O'Donnell gave back a mortgage on it [the land] for $30,000, and he gave a mortgage to Rosier, Sheehan, and O'Brien for something over $8,000. That was with my knowledge and consent. O'Donnell then moved on the farm. Subsequent to O'Donnell, moving on the farm, it was rented to a man named Lawless, by me. Lawless occupied the land for more than a year under the lease which I made. This lease was made as a. trustee, under the name of a trustee for myself and my associates, Gerald [G. F. Sharon] and Joe [J. J. McGuire]. O'Donnell subsequently conveyed to me title to my proper share in this farm. He gave one deed for one-half interest. This was jointly to me, my brother Gerald, and Joe McGuire. It was made in the spring of 1922. I paid my proper proportion of the interest on this Bond mortgage [the one foreclosed] after it was given. That was contributed in proper proportions by O'Donnell, McGuire, and my brother Gerald, and myself. I paid interest on the $30,000 mortgage in 1921, 1922, and 1923. We haven't paid any since then.''

A deficiency in the sum of $7,893.31 remained, after applying all sums received under the foreclosure. Such is the item in controversy, and the district court entered judgment in favor of appellees therefor.

Eight grounds are relied upon for reversal. All, however, are grouped under three main heads, for the purpose of argument, as follows: First, that a mere assignee of a real estate contract is not burdened with the necessity of performing the assignor's duties thereunder; second, there is no liability in the case at bar growing out of a partnership relation; and third, there can be no recovery on the theory of cotenancy. Thus, it is urged by appellants that, because the foregoing is true, there can be no liability upon them for the note and mortgage, assigned, executed, and delivered by O'Donnell alone.

As we understand appellees' contention, they do not rely upon assignment or cotenancy as forming a basis of their cause of action, but rather, they treat both as mere incidents or evidentiary facts tending to establish their main grounds of recovery. .

Two propositions are advanced by appellees to meet appellants' argument, which are that: First, a new oral contract was

908

made by and between appellees, appellants, McGuire, and O'Donnell on March 1, 1920, whereby the note and mortgage executed in the name of Simon O'Donnell were for the joint adventure of the four last named, and all of them were liable for the debt; and second, appellants, McGuire, and O'Donnell were members of a joint adventure, formed for the purpose of purchasing appellees' farm for speculation, and consequently each member of the undertaking is liable for the burdens thereof necessary to carry out the contemplated objects.

I. Something is said in argument by appellants regarding the sufficiency of the pleadings. No special reliance, however, seems to have been placed upon this thought; yet, after a careful review of the petition filed and the theory of the trial, we are of the opinion that it was not improper for appellees to advance their doctrines of recovery herein.

II. Permeating the testimony and documentary evidence introduced was the thought that the real parties in interest concerned in the final purchase of this farm were McGuire, O'Donnell, and appellants. Long before March 1, 1920, this joint interest was acquired, and was afterwards constantly maintained until 1923, or thereabouts, when appellants and McGuire obtained the entire equity of O'Donnell, in addition to what they previously held. The original agreement of Fouts and McGill contemplated and provided for the execution by them of the $30,000 note, as well as the mortgage securing it. Likewise, the contract assigned to appellants and their associates intended a similar note and mortgage.

O'Donnell, acting for himself and his co-operators, together with P. J. Sheehan,—undoubtedly the agent for all four,—induced appellees to forego the agreement with Fouts and McGill and their personal liability, and accept in lieu thereof the note and mortgage assigned by O'Donnell, behind which, it was said, was the financial responsibility of appellants et al. Even though the statements of the alleged agent made March 1, 1920, were eliminated, nevertheless there is sufficient remaining in the record upon which to base recovery against appellants for the original debt, by virtue of the oral contract made March 1, 1920. Under this arrangement appellants acted, knowing of the transfer to O'Donnell and the terms and conditions thereof. Consistent with this information and plan, these men for at least

three years carried out the terms of the written compact, during which time they had possession of the farm. Manifestly, the execution of the note and mortgage by O'Donnell was not alone for himself, but also for McGuire and appellants; and as a result, the indebtedness evidenced thereby was theirs, as much as his, even though the proof thereof, in order to hold them, would be different from that which would be sufficient to bind him only. Included among the real parties in interest were appellants and McGuire. *Collentine v. Johnson*, 203 Iowa 109. Responsibility of the parties to negotiable paper, as contemplated by Section 9478, Code of 1924, is not raised or involved, and therefore we do not enter into that field of investigation.

III. There is another theory upon which appellants can be held to liability here. It is through the principle of joint adventure.

Before making application of that doctrine, it is essential to determine its definition. Webster's New International Dictionary defines "adventure" as:

"That which happens without design; chance; hazard; hap; hence, chance of danger or loss; the encountering of risks; hazardous and striking enterprise; a bold undertaking in which hazards are to be met and the issue hangs upon unforeseen events."

An important distinction is to be here noted between "joint adventure" and "joint ownership." Similarity appears in the common interest, but a difference arises because the latter lacks the feature of "adventure." *McCarney v. Lightner*, 188 Iowa 1271; 33 Corpus Juris 842, Section 3.

Speaking of a "joint adventure," Corpus Juris, in Volume 33, on page 841, says:

"A joint adventure has been aptly defined as a 'special combination of two or more persons, where, in some specific venture, a profit is jointly sought, without any actual partnership or corporate designation. * * * A joint adventure, as a legal concept, is of comparative recent origin. It is purely the creature of our American courts. At common law, an enterprise of a limited character, such as is now called a joint adventure, was regarded in law as merely an informal kind of partnership, and the courts made no attempt to distinguish the one from the other. * * * in

the United States, the courts, about the middle of the last century, began to find it convenient to draw a distinction between them; and hence there is gradually building up a body of American law applicable to the relation of joint adventures, which may or may not apply to the relation of partners. So far, the divergence between the two relations is very slight; so slight, in fact, that it is generally asserted that they are governed by the same rules of law.''

Previously, on several occasions, we have found it necessary to speak of ''joint adventure.'' *Senneff v. Kelleher*, 155 Iowa 82; *Nelson v. Lindsey*, 179 Iowa 862; *Goss v. Lanin*, 170 Iowa 57; *Barton v. Wamsley*, 194 Iowa 591; *Tusant & Son Co. v. Weitz Sons*, 195 Iowa 1386. *Goss v. Lanin*, supra, consistently explains:

''While it is true that, at common law, coadventurers in an enterprise were recognized in courts, only when the element of partnership was disclosed, and upon proof of the essentials of a partnership, this is not the law at the present time; and, although courts in modern times do not treat a joint venture as identical with a partnership, it is so similar in its nature and in the contractual relationships created by such adventure that the rights, as between themselves, are governed practically by the same rules that govern partnerships. As some of the courts hold, while a partnership is ordinarily formed for the transaction of general business of a particular kind, a joint adventure, as a rule, relates to the single transaction, although it may comprehend a business to be continued for a period of years.''

IV. Difficulty arises in determining the liability to third persons of the coadventurers, as compared with that of copartners. Is it the same? If so, under what circumstances? Hinting at this distinction, we suggested, in *Nelson v. Lindsey*, supra:

''The brief of appellant is directed at this point wholly to the proposition that the contract in question did not create a partnership between Gray and Florine, in that it imposed upon Florine no obligation to share any part of the losses of the business. It may as well be assumed, for the purpose of this case, that a partnership was not created between Gray and Florine. * * * If this were a suit wherein it was sought to hold Florine liable for the debts incurred in the business, the proposition contended for by appellant would be quite decisive.''

Assistance at this point is afforded by a quotation from 33 Corpus Juris 871, Section 99:

"As to third persons who deal with a joint adventurer in good faith and without knowledge of any limitation upon his authority, the law presumes him to have been given power to bind his associates by such contracts as are reasonably necessary to carry on the business in which the joint adventurers are engaged; and they become liable upon such contracts, notwithstanding they may have expressly agreed amongst themselves that they should not be liable. But he cannot bind his associates by contracts made outside of the scope of the business in which they are engaged, or by contracts made for his individual benefit."

That is true because, in such event, the status of the parties amounts to a "technical" or "limited" partnership. *Jones v. Walker*, 51 Misc. Rep. 624 (101 N. Y. Supp. 22) ; *Mission Ridge Land Co. v. Nixon* (Tenn. Ch. App.), 48 S. W. 405. During the discussion in the *Nixon* case, it was declared:

"The second assignment of error raises the question that appellant did not sign the notes, and therefore no personal decree should have been rendered against him. We do not think this error is tenable, under the facts. Mr. Nixon negotiated the purchase of these lots for himself and the other parties, with an agreement among themselves as to the interest of each in the purchase, and with the further agreement that, as the representative of all, he should give his notes, as trustee for all, and take the title to himself, as trustee for all. This being so, his contract and obligation was, under the law, the joint and several contract of all. * * * In a note so signed, we understand the law to be that the parties in fact included in the contract may be held liable. * * * As we construe the evidence in the record, these parties entered into a joint enterprise to buy these lots."

*Jones v. Walker*, supra, approves this statement:

" 'A joint venture is a limited partnership, *not limited in a statutory sense as to liability, but as to scope and duration* [the italics are ours] ; and under our law, joint adventures and partnerships are governed by the same rules.' "

Apparently, then, liability of a member of a "joint adventure" may originate from at least three sources: First, a direct contract with the creditor suing; second, on the theory of agency,

arising under the express or implied right of other members of the project to bind a particular one of the group by contracts within the scope of the "authorized" enterprise (this always depends upon the sufficiency of the circumstances in each case); and third, when the facts warrant it, this responsibility can be established through the principle of partnership, when there is contemplated a mutual bearing of the losses. Consequently, in the case at bar, a member of the group whose "joint adventure" was to buy land for speculation had authority to bind each member of the organization for the necessary purchase price of such real estate, under the doctrine of agency, wherein he, as the representative of the others, was acting within the contemplated sphere of the endeavor. Appellees, however, need not rest their case on that ground alone, for the reason that, under the peculiar circumstances here involved, the "joint adventurers" were partners for the limited scheme mentioned. *Johnson Bros. v. Carter & Co.*, 120 Iowa 355; *Lutz v. Billick*, 172 Iowa 543.

We announced in *Johnson Bros. v. Carter & Co.*, supra:

"In the decisions of this court denying the existence of a partnership because of there being no obligations to share the losses, the agreements have been such as to exclude any such inference. * * * From these authorities [those cited in the opinion] may be deducted, as established in this state, the following principles: (1) That the agreement only to share profits will not constitute partnership, though evidence of existence of that relation. (2) The sharing of losses is essential in a partnership, though the undertaking to do so may be inferred from an agreement to divide profits, unless precluded by the terms thereof. (3) That payment for services, or for the use of money or property to be used in the business, may consist of a share of profits, without making of the loaner or employee a partner."

Cited in the *Johnson Bros.* case is *Richards v. Grinnell*, 63 Iowa 44, which states:

"* * * it is not necessary, in order to constitute a partnership, that there be an express agreement that each party shall bear a share of any losses which may occur in the business. This may be inferred from other provisions of the contract, and the nature of the business, and the relation of parties to the business to be transacted."

Again, in *Lutz v. Billick*, supra, we suggested:

"Profits certainly were contemplated [in the enterprise there discussed], for the purpose was to acquire the title to the land through the payment of debts and incumbrances against it; but nothing was said of sharing losses. This was clearly to be implied from their undertaking to share profits, the nature of the enterprise, and their relation thereto."

. Resultantly, in the case before us, appellants were engaging in a "joint adventure" with O'Donnell and McGuire. Its purpose, as shown by their words and conduct here, together with their actions in other similar transactions, was to buy and sell for gain. Speculation always has its hazards. These men were experienced. They knew of the possibility that there might be loss, and to say that those investors did not contemplate and impliedly agree to share the deficits is to ignore "their undertaking to share profits, the nature of the enterprise, and their relation to each other." *Lutz v. Billick,* supra.

The judgment and decree of the district court is affirmed.— *Affirmed.*

STEVENS, C. J., and EVANS, DE GRAFF, ALBERT, MORLING, and WAGNER, JJ., concur.