Marvin J. COLES, Appellant,

v.

REDSKIN REALTY CO., a corporation,
Appellee.

No. 3060.

Municipal Court of Appeals for the
District of Columbia.

Argued Sept. 5, 1962.

Decided Oct. 26, 1962.

Stanley O. Sher, Washington, D. C., with whom Coles & Goertner, Washington, D. C., was on the brief, for appellant.

Robert B. Frank, Washington, D. C., with whom Milton W. King and Bernard I. Nordlinger, Washington, D. C., were on the brief, for appellee.

Before HOOD, Chief Judge, QUINN, Associate Judge, and CAYTON (Chief Judge, Retired), sitting by designation under Code § 11–776(b).

HOOD, Chief Judge.

In this action the appellee sought to recover from appellant a debt said to be due under an agreement between appellee and members of a syndicate formed for the purchase and sale of real estate in the District of Columbia. The issue was joined on the question whether or not appellant was bound by this agreement.

The trial court, sitting without a jury, found as facts the following. Sometime in 1952 George P. Marshall brought to the attention of one John W. Harris the availability of certain land located in the District of Columbia. Harris formed a syndicate and obtained an option to purchase the land, and individual members of the syndicate at that time agreed to pay Marshall ten per cent of the syndicate profits in consideration for his services as finder of the land. Appellant Coles testified that he entered the syndicate after its original formation, contributing $10,000, and that he entered the syndicate without knowing of its arrangement with Marshall. Harris obtained successive renewals of the option; after the last of these had expired, Harris arranged for the purchase of the land by the American Securities Corporation. American Securities, Hegeman-Harris Company (a corporate syndicate member organized by Harris) and others jointly developed the site, building cooperative apartments and offices there, and realized substantial profits from the transaction. Harris made agreements with various members of the former syndicate to pay them certain sums as their share of these profits. One such agreement was made with appellant; as a result, he realized a gross return on his $10,000 investment of $25,550.17.

In 1957 Marshall made demands on the individual members of the syndicate for ten per cent of their profits. Counsel for Hegeman-Harris appraised this claim as having considerably more than nuisance value, concluding that the publicity attendant upon the filing of a damage suit by Marshall would have a detrimental effect on the project, and urged that an equitable settlement be sought. Accordingly, an agreement was drawn up, with Hegeman-Harris and the individual members of the syndicate as parties of the first part, and George P. Marshall and appellee Redskin Realty Co., his assignee, as parties of the second part. Under this agreement, the syndicate members agreed to pay Marshall five per cent of their profits. All individual members of the syndicate except appellant and one other [1] signed this agreement. Appellant refused to do so, claiming that he recognized neither a legal nor a moral obligation to Marshall or to Redskin Realty, and thereafter persisted in his refusal to pay.

The trial court reasoned that appellant could be found liable only on the theory that as a member of the syndicate he was bound by the agreement entered into by a majority of the syndicate members. Characterizing the syndicate as a partnership, the court then considered whether the contractual provisions for payment to Marshall were in the nature of a distribution of profits or a fee for services.

Originally, at the conclusion of trial, the court was of the opinion that the agreement represented a distribution of profits, requiring the unanimous consent of the partners, and entered a finding for appellant. Thereafter, on appellee's motion for judgment notwithstanding the finding or for a new trial, the court reconsidered its earlier conclusion, and determined that its finding had been "in error as a matter of law." The court now decided that the agreement was for the payment of a fee, and that a majority of part-

---

1. It appears from appellee's brief that this member's successor in interest eventually paid the amount due appellee from him.

ners could bind dissenting partners to such an agreement. Granting appellee's motion, the court found appellant Coles liable on the agreement for $777.51.

At the outset appellant contends that the trial court was without power to reverse its finding after it had been formally entered, since, he argues, that finding involved a question of fact or at least a mixed question of fact and law.[2] It is undoubtedly correct that the trial court's statement that it had been in error "as a matter of law" does not foreclose this court from determining that a question of fact was involved.[3] But we are satisfied that the trial court's change of opinion resulted from a reconsideration of the written agreement itself, and not from a reappraisal of the parol evidence offered in aid of interpretation.[4] The uncertainty as to the nature of the agreement did not arise from ambiguity of language, which could be resolved through parol evidence as to usage or surrounding circumstances. Where "the difficulty of interpretation must be solved from the writing alone," the court will deal with the matter itself. Williston, Contracts § 616 (3rd ed. Jaeger). This we believe to be the case here. All the operative facts necessary to the trial court's determination were fully set forth in the written agreement. There is no explicit reference by the court to testimony dehors the agreement. It remained only to draw a legal conclusion as to the nature of the agreement. The court reached one conclusion at the close of trial; another, upon consideration of a seasonably presented motion. This the court, under the decided cases, was free to do.

Appellant's next contention is that the syndicate to which he belonged was a joint venture rather than a partnership, and that a majority of joint adventurers cannot bind the minority over its objections. Alternatively, appellant suggests that if the syndicate be considered a partnership, the agreement represented a distribution of profits, a matter requiring the unanimous consent of the partnership.

We are convinced that the trial court correctly determined the agreement to be for the settlement of a claim through the payment of a fee, rather than in the nature of a distribution of profits. Although Marshall's compensation was to be determined on the basis of a percentage of profits, the language of the agreement makes it abundantly clear that its overriding purpose was to settle Marshall's claim and forestall suit. The agreement recites, for example, that Marshall brought to Harris's attention the availability of certain lands; that by letter of November 18, 1952, the syndicate members agreed to pay him ten per cent of profits in consideration for his bringing the optioned lands to their attention; that a dispute arose over Marshall's rights under that letter, with Marshall indicating an intention to institute litigation "to ascertain and enforce his rights"; and that the parties then "indicated their desire and willingness to adjust all matters of dispute without necessity for resorting to litigation." In two similarly worded paragraphs, the agreement provides that the five per cent profit participation is accepted by Marshall and Redskin Realty in full settlement of all claims against the syndicate members.

That it was a considerable advantage to the syndicate to settle Marshall's claim in this manner, rather than to contest it in court, is evidenced by the syndicate counsel's estimate of its precarious position and of the harm which could result to the syndicate from the filing of a lawsuit. It is noteworthy, moreover, that the corporate member of the syndicate and seven out of nine of the individual members considered

2. See Rice v. Simmons, D.C.Mun.App., 53 A.2d 587; Roumel v. Stradley, D.C.Mun. App., 119 A.2d 111.

3. Smith v. Fletcher, 80 U.S.App.D.C. 263, 152 F.2d 20; Bendix Home Appliances v. Radio Accessories Co., 8 Cir., 129 F.2d 177.

4. See Rich v. Sills, D.C.Mun.App., 130 A.2d 920; Soldano v. Holmes, D.C.Mun.App., 60 A.2d 535.

the settlement of Marshall's claim in return for five per cent of the profits a sufficient advantage to them individually to affix their signatures to the agreement.

■ The question remains whether appellant, who recognized no legal or moral obligation to Marshall, who consistently made known his opposition to the fee agreement, and who was one of two individuals who refused to sign, could be bound under the agreement. Our conclusion is that he could be, and was. In reaching this conclusion we attach no great significance to whether the syndicate was a partnership or a joint venture. Where a syndicate is formed for the purchase, development and sale of real estate, our United States Court of Appeals has classified it as a joint venture, which "may fall short of being a partnership or an agency." Libby v. L. J. Corp., 101 U.S.App.D.C. 87, 247 F.2d 78; see also, McCausey v. Burnet, 60 App.D.C. 201, 50 F.2d 491. But it has also been said of a real estate syndicate that it is "a partnership agreement, or a joint adventure having in general the legal incidents of a partnership." 30 Am.Jur., Joint Adventure, § 15. The trend in the law has been to blur the distinctions between a partnership and a joint venture; very little law is found applicable to the one that does not apply to the other. See George W. Haxton & Son v. Rich, 267 App.Div. 492, 47 N.Y.S.2d 501; 36 Va.L.Rev. 425, 38 Calif.L.Rev. 860.

■ While the partnership is in being, the act of one partner within the scope of the partnership business binds all partners, on the theory of an implied mutual delegation of authority. Pottash Bros. v. Burnet, 60 App.D.C. 167, 50 F.2d 317. And the same is true of joint ventures, with respect to

contracts reasonably necessary for the furtherance of the project.[5] Professor Mechem has said: "It is generally held that there is the same element of mutual agency in joint adventures as in partnerships. Upon principle this is the more desirable rule, for if persons combine their resources in a common undertaking, the resulting association will almost invariably be one warranting the implication of a mutual agency." 15 Minn. L.Rev. 644, 654.

If the agreement with Marshall was reasonably necessary to carry out the syndicate's purpose, appellant could not have prevented the execution of the agreement by his dissent, nor could he avoid individual liability under the agreement by refusing to sign or otherwise making known his opposition. And we have little doubt that the agreement with Marshall could be considered reasonably necessary, since it foreclosed the possibility of litigation with Marshall. It is not a farfetched conclusion that the existence of this agreement was one of the primary elements making possible the substantial profits which inured not only to those who signed but to Coles as well.

Appellant's last contention is that if he is to be bound by the agreement, he is entitled to its benefits as well as its burdens. He maintains that certain issues remained in dispute, and that these issues should have been referred to arbitration as provided in the agreement; and that the trial court, after determining that appellant was a party to the agreement, should have stayed further proceedings pending reference of these questions to arbitration.[6]

■ Appellant concedes that the arbitration provision is enforceable only if the Federal Arbitration Act, 9 U.S.C.A. § 1 et

5. Taylor v. Brindley, 10 Cir., 164 F.2d 235; Chisholm v. Gilmer, 4 Cir., 81 F.2d 120, affirmed 299 U.S. 99, 57 S.Ct. 65, 81 L.Ed. 63; Bond v. O'Donnell, 205 Iowa 902, 218 N.W. 898, 63 A.L.R. 901; Rae v. Cameron, 112 Mont. 159, 114 P.2d 1060; Crane, Partnerships, § 35 (2d ed.). Whether the existence of an express agreement limiting liability among the

syndicate members might produce a different result in dealings with third persons we need not now decide, since there was no such express agreement. See Taylor v. Brindley, supra.

6. See Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978.

seq., is applicable. The Act applies to contracts "evidencing a transaction involving commerce." 9 U.S.C.A. § 2. It is argued that the transaction "evidenced" by this agreement involves the purchase and sale of real property, because the agreement stemmed from appellee's insistence that it was entitled to a share of the proceeds from the sale of options on real estate. This may be so, but the agreement itself, as we have already concluded, simply provided for the settlement of a claim through the payment of a disputed fee. In John W. Johnson, Inc. v. 2500 Wisconsin Avenue, Inc., 98 U.S. App.D.C. 8, 231 F.2d 761, the contract involved the painting of a building and remuneration therefor.[7] Neither party contended that such a contract was a transaction involving commerce, and the court agreed that it was not. The connection with commerce is still more remote here. However broadly "commerce" has been construed under the Federal Arbitration Act, that term has not yet been applied to contracts settling a claim. Since the statute could not be invoked to require the arbitration of issues allegedly in dispute, the trial court acted properly in deciding the case without reference to arbitration.

Our conclusion is that the trial court's disposition of the contested issues was correct.

Affirmed.

---

7. See also, Conley v. San Carlo Opera Co., 2 Cir., 163 F.2d 310. Metro Industrial Painting Corp. v. Terminal Construction Co., 2 Cir., 287 F.2d 382, certiorari denied 368 U.S. 817, 82 S.Ct. 31, 71 L.Ed.2d 24, also involved a painting contract, to be performed in one state, but the court found sufficient interstate elements to bring the contract within the Federal Arbitration Act.