EASTERN IRON AND METAL CO. *v.* H. C. PATTER-
SON, PATTERSON CONSTRUCTION CO., LTD.,
WILLIAM G. MEAGHER, INDUSTRIAL DEVEL-
OPMENT, AN HAWAIIAN [SIC.] COPARTNER-
SHIP, JOHN DOE ONE, JOHN DOE TWO AND
JOHN DOE THREE.

NO. 2764.

ARGUED FEBRUARY 19, 1952.                    DECIDED APRIL 9, 1952.

TOWSE, C.J., LE BARON AND STAINBACK, JJ.

OPINION OF THE COURT BY LE BARON, J.

This is a bill in equity for injunction, establishment of
constructive trust and incidental relief. Attached to it and
made parts thereof are a written agreement for sale and

delivery executed at Los Angeles, California, between the petitioner, a foreign corporation, as buyer, and the respondent, Patterson Construction Company, Limited, a Hawaiian corporation, as seller, and a supporting bill of sale contemporaneously delivered to the petitioner by that respondent. The terms of the agreement are that the respondent corporation warranted that it was "the owner * * * and in a position to convey title and possession" of 1500 tons of cast-iron scrap and agreed to sell that cast-iron scrap to the petitioner at the rate of $50 per ton to be delivered at Los Angeles by a certain steamship line, in consideration of which the petitioner agreed to purchase such scrap at that rate so delivered and to pay $35,000 in advance. The agreement recited that the "bill of sale transferring title as of this date for said merchandise" was delivered as evidence of the warranty expressed in the agreement or contract itself and that "Title is conveyed for the purpose of assuring performance of this contract, but the fact that title is so conveyed shall not affect the liabilities or responsibilities fixed upon the Seller [i. e., the respondent corporation] by reason of the fact that the merchandise is being sold F.O.B. rail cars Los Angeles Harbor." The bill of sale, so delivered and so conveying title, described the 1500 tons of cast-iron scrap sold as 600 tons thereof "now located at Wainae Sugar Mill, Oahu" and as 900 tons "now located at Waimea Sugar Mill, Kauai, Territory of Hawaii." The bill for injunction alleges that the "Petitioner has in accordance with his contract paid to Respondent Patterson Construction Company, Limited, the sum of $35,000.00 in and for partial payment for said scrap cast iron."

As grounds for equitable relief, the bill alleges (1) that the respondent corporation "is insolvent and has no intention of complying with the terms of said contract or of delivering said merchandise" [i. e., said cast-iron scrap];

348

(2) that the respondent corporation and H. C. Patterson, its president, and respondent Industrial Development, a foreign copartnership, and William G. Meagher, its attorney in fact, "have entered into a plan to defraud Petitioner of said merchandise and to convert same to their own use"; (3) that "in furtherance of their plan said Respondents are now in the process of loading said merchandise on a barge or barges * * * to be shipped to an unknown destination * * * [and of] mixing the cast iron scrap sold to Petitioner with other scrap so that the same cannot be identified" and have already done so in part; (4) that "if said scrap is converted as alleged, Petitioner will suffer irreparable damage"; (5) that "Petitioner does not have a complete, full and adequate remedy at law."

The relief prayed in the bill is (1) to require the respondents to show cause why they should not be permanently enjoined from shipping said merchandise to anyone other than to the petitioner at Los Angeles; (2) to issue a temporary restraining order restraining them from conveying, transferring, shipping, loading or encumbering any cast-iron scrap until the title to the same has been determined judicially; (3) to impress a trust on said merchandise in favor of petitioner; (4) to set aside and cancel any sale of said merchandise made from respondent corporation to any of the other respondents; (5) to issue a mandatory injunction requiring respondent corporation to comply with the terms of said agreement and to give proper security therefor; (6) to order respondents to pay damages sustained by petitioner and his costs, and for such other and further relief as may be appropriate.

On the filing of the bill, a temporary restraining order and an order to show cause issued. After various returns, answers, motions to dissolve the temporary restraining order and other pleadings made by the respondents, the cause came to issue and on stipulation of the parties a trial

on the merits was held. At the close of trial the presiding judge in equity, by oral decision and thereafter by interlocutory decree, dismissed the bill in its entirety and denied its prayer for equitable relief but reserved the question of damages which may have been suffered by the respondent copartnership pending disposition of the instant appeal, which the petitioner had indicated that it would take from that decree.

The specifications of error meriting consideration challenge the interlocutory decree and present five paramount and interdependent questions pertaining to the written warranty agreement for sale and delivery. The first question so presented is whether that agreement constitutes a valid and binding contract of sale and purchase upon the respondent corporation and the petitioner as parties thereto. The second is whether the sale made therein was authorized by the terms of an existing oral agreement for joint venture which the respondent corporation had entered with the respondent copartnership. The third is whether the sale made by the respondent corporation to the petitioner was an exercise of such authority within the scope of the joint venture. The fourth is whether the respondent copartnership is bound by the contract made by the respondent corporation. The fifth is whether those respondents are in breach of contract, and if so, what is the nature thereof and the part played therein by the other respondents?

As to the first question, the written warranty agreement for sale and delivery on its face unquestionably meets every requisite of a valid and binding contract. The respondents claim that it does not bind the respondent corporation because that corporation did not expressly ratify the contract but, according to respondent Patterson's testimony, subsequently rejected it. They do not seriously claim, however, that the respondent Patterson, who signed

the contract on behalf of the corporation as its president, did not have authority to bind the corporation to that contract. Nor could they reasonably do so under the undisputed evidence which shows that the contract was executed by the president of the corporation in the ordinary course of the corporation's business as had been adopted by the corporation without dissent in the past, such as in its prior transfer to the joint venture and dealings of a similar nature with the petitioner itself. That evidence establishes that the respondent Patterson, as president and chief administrative officer, had at least apparent authority, if not expressed or implied authority, to bind the corporation to the contract and that the petitioner had the right to rely on that authority. (For collection of authorities see 13 Am. Jur. § 890, p. 870.) Being so authorized, the contract did not require ratification. Admittedly, the act of the respondent Patterson was on behalf of the corporation in executing the contract and in perpetrating a fraud upon the petitioner. Under the undisputed evidence, that act as to both phases, assuming *arguendo* it be unauthorized, was impliedly ratified by the corporation when it accepted $35,000 on the contract and retained that money for a corporate expenditure and then rejected the contract without returning or repaying such money and without any intention of doing so. In any event, the respondents Patterson and corporation are estopped to deny the validity and binding effect of the contract. (See 2 Fletcher *Cyc. Corp.* [perm. ed.] § 773, p. 826.) Nor can corporate liability be avoided on the contention that the respondent corporation was under duress because it was in desperate need of money and because the petitioner would not admit or pay what the respondent corporation claimed the petitioner owed it on a prior but separate and distinct transaction. The petitioner at all times consistently claimed that the respondent corporation owed it money on that transaction.

At no time surrounding the instant contract did the petitioner threaten the respondent corporation but when pressed by the respondent Patterson merely exercised its legal right to deny the respondent corporation's assertion of prior claim and to assert one of its own, the presiding judge in his oral decision correctly pointing out that those conflicting claims are not susceptible of determination in this case but require an accounting beyond the issues thereof.  The exercise of that right in no way affected the validity and binding effect of the contract or compelled the respondent Patterson, on behalf of the respondent corporation, to enter into that contract so as to constitute duress, even though the corporation's financial distress may have been the motive for the perpetration of fraud upon the petitioner.  Nor are there present in this case any of the concomitants of duress or any other elements of lack of good faith on the part of the petitioner as a bona fide purchaser.  Thus, that contention of duress is untenable and so are the other contentions of the respondents in challenging, as they do, the validity and binding effect of the written contract by parol evidence contrary to its terms and in contradiction of its clear and unambiguous language.  The first question is therefore answered in the affirmative.

As to the second question, the evidence is undisputed that respondent corporation and respondent copartnership, by oral agreement, entered into a continuing joint venture for the purchase, preparation and sale of scrap iron one month before the written agreement was executed and the supporting bill of sale delivered.  The parties to the joint venture, however, intended that such oral agreement would be supplemented by a complete and formal agreement in writing at some time in the future and in the meantime would be subject to change.  They entered into a written agreement for joint venture of that nature four days after the petitioner filed its instant bill in equity but dated it as

of the date of the oral agreement. The terms of both agreements for joint venture prove the creation of the joint venture which existed at all times within the ambit of this case. The respondent corporation divorced itself from the scrap-iron business by transferring to the joint venture all its scrap iron at the approximated actual value of $97,158.10 and the respondent copartnership contributed $115,000 in cash to the joint venture, the parties agreeing to share equally in the net profits and losses. Nevertheless, the terms of the oral agreement, in so far as they authorize one joint adventurer to sell without the consent of the other, are in dispute between the respondent Meagher as attorney in fact for the respondent copartnership and the respondent Patterson as president of the respondent corporation.

Respondent Meagher testified in effect that the oral agreement for joint venture had been previously set forth in a written memorandum but that, by mistake, the name of a third party, a foreign corporation of which he was president, was substituted for that of the respondent copartnership of which he was attorney in fact, the mistake presumably arising from the inadvertent use of a form agreement. He further testified that such memorandum was regarded by the respondent parties as tentatively embodying the terms of their oral agreement until a complete and formal contract could be executed. The respondent copartnership introduced into evidence that written memorandum in which there is absent any specific provision prohibiting one joint adventurer from selling without the consent of the other. In the absence thereof, it is presumed that each coadventurer was the authorized agent for the joint venture to sell as a transaction of the joint venture, despite the provision contained in the written memorandum that "Sole authority and responsibility for the operation of this Joint Venture shall be in a Committee composed of one (1) representative from each party to this agreement; and

any and all decisions made by this Committee shall be binding on the parties to this agreement" where, as here, there is nothing to indicate a contrary conclusion and no evidence tending to show that such a committee was in existence or made any decision whatsoever. The testimony of respondent Meagher, so corroborated, is deemed to be better evidence of the terms of oral agreement than the testimony of the respondent Patterson, who admittedly intended to defraud the petitioner. Indeed, had the mistake of party not been made the written memorandum would have been in lieu of the oral agreement or a reduction to writing of it. Under that view of the evidence, either joint adventurer was authorized to sell without the consent of the other and the particular sale in question would be authorized, provided only that it was within the scope of the joint venture.

The respondent Patterson testified in effect that the terms of the oral agreement for joint venture were substantially the same as those in the subsequent written agreement which specifically prohibited sales "at less than the prevailing market price" by one party "without the consent of the other," the necessary implication being that sales at or above the prevailing market price by one party without the consent of the other were authorized. That specific provision controls, as the applicable provision, rather than the general provision against incurring "any indebtedness on behalf of the joint venture" or obligating "it in any way" by one party. Nor does the other general provision apply, which places "Sole authority and responsibility for the operation of the joint venture" in a committee and makes all its "decisions * * * binding on the parties" where, as here, there is no evidence tending to show, and the respondents have failed in their burden of proof to show, that such committee, if one existed and functioned, made any decision whatsoever. Pertinent to the application of the authority to sell at the prevailing market price under the necessary

implication of such specific provision, the only evidence in the record of the prevailing market price at Los Angeles, the place of delivery, at the time of sale for the particular type of cast-iron scrap sold is the undisputed testimony of the president of the petitioner, an experienced dealer in scrap iron, that such prevailing market price at that place and time was $50 per ton, which is the rate of contract price set forth in the written agreement for sale and delivery. Thus, under that view to the same extent as under the other view, the sale in question would be authorized, it being at and not less than the prevailing market price and not requiring the consent of the other party under the terms of either the oral or written agreement for joint venture. The second question is therefore answered in the affirmative.

As to the third question, it is true that the respondent corporation, prior to its entry into the contract and delivery of the supporting bill of sale for 1500 tons of cast-iron scrap, had transferred all its scrap iron, inclusive of cast-iron scrap, to the joint venture. But it is equally true that such respondent was then joint owner with the respondent copartnership of all the joint venture's scrap iron, inclusive of cast-iron scrap so transferred or otherwise acquired, and, as already indicated, had the authority to sell that property or any part of it wherever located. It follows therefrom that the respondent corporation, being such joint owner, was "in a position to convey title and possession" as warranted, and exercised its authority within the scope of the joint venture when binding itself to the contract and bill of sale provided that the particular property involved constituted joint-venture property. That property is specifically identified by those documents to be 1500 tons of cast-iron scrap, which the bill further describes by locating 600 tons thereof at Waianae and 900 tons at Waimea. Nor is that description disturbed or the ex-

pressed warranty vitiated by the fact, as later proved at the trial, that only 216 and 200 tons of cast-iron scrap were actually located at those places at the time of sale to the petitioner. That fact, rather, goes to the question of breach of expressed warranty as to quantity. It is sufficient for the purpose of the question under consideration to decide whether the 416 tons of cast-iron scrap actually so located constituted joint-venture property.

The respondents admit that the evidence proves that the 216 tons of cast-iron scrap actually located at Waianae at the time of sale to the petitioner constituted joint-venture property, but they contend that the 200 tons at Waimea was then the property of a third party, as a part of his sugar mill, rather than the property of the joint venture. They further contend that those 200 tons never became property of the joint venture so as to be subject to sale to the petitioner. The undisputed evidence, however, does not show that the joint venture was so bypassed by the parties thereto with respect to such property. That property was a subject of transfer to the joint venture by the respondent corporation, even though that respondent was in the process of negotiating for its purchase and thereafter continued negotiations to purchase it for the joint venture but was financially unable to consummate such purchase. Nevertheless, during that period of negotiation the parties to the joint venture after the transfer treated the property as if it were joint-venture property. This is evidenced by the fact that during such period the joint venture itself dismantled the sugar mill, prepared the metal secured therefrom as cast-iron scrap, loaded it on a barge and shipped it. While in the course of being so handled by the joint venture, but after the sale to the petitioner and notice of petitioner's claim, that property was purchased by the respondent copartnership in its own name when it became obvious that the respondent corporation was not able to

purchase it for the joint venture. Under those facts and circumstances, the property in question at the time of sale to a third party by one joint adventurer is deemed to have been joint-venture property and its acquirement by the other deemed to have been made for the joint venture, it being immaterial that title was taken in the name of the purchasing joint adventurer, who is regarded as holding it as trustee for the joint venture. (See *Cassidy* v. *Gould,* 860 Okla. 217, 208 Pac. 780.) Thus, the 200 tons at Waimea at the time of sale to the petitioner constituted joint-venture property, even though the respondent copartnership thereafter may have had a joint-adventurer's lien upon it for its purchase price as against the respondent corporation but not as against the petitioner as an intervening third-party purchaser under a warranty sale, such lien being strictly between the parties to the joint venture. The contract and bill of sale, being exercises of the same authority to sell and covering property actually constituting joint-venture property at the time, therefore demonstrate that the transaction as a whole was within the scope of the joint venture, the expressed warranty being reasonably necessary to complete the sale in furtherance of the common enterprise and its purposes. The third question is therefore answered in the affirmative.

As to the fourth question, the law is well-settled that the "* * * liabilities of joint adventurers are governed, in general, by rules which are similar or analogous to those which govern the corresponding * * * liabilities of partners, except as they are limited by the fact that the scope of a joint adventure is narrower than that of the ordinary partnership. Accordingly, as a general rule, each of several joint adventurers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise. Thus, a member of a joint adventure can bind his associates,

whether disclosed or undisclosed, by such contracts as are reasonably necessary to carry on the venture." (30 Am. Jur. § 41, p. 699.) This is particularly true where a joint adventurer is not expressly forbidden to sell within the joint-venture purpose of selling or has been given authority to do so by necessary implication as in this case. Each member of a joint venture acts individually and as agent for other members within the general scope of the enterprise or in furtherance of the business in which they are engaged. Being closely akin to a partnership, the law of partnership and principal and agent underlies the conduct of the venture and governs the rights and liabilities of the joint venture, and of third parties as well. Generally, one adventurer is empowered to sell and convey property involved in the joint venture, if such sale is not expressly prohibited and is in furtherance of the purposes of the joint enterprise. (See *Dobbins* v. *Texas Co.,* 136 Okla. 40, 275 Pac. 643; *Bond* v. *O'Donnell,* 205 Ia. 902, 218 N. W. 898; *Federal Underwriters Exchange* v. *Coker,* [Tex. Civ. App., 1938], 116 S. W. [2d] 922; *Proctor et al.* v. *Hearne,* 100 Fla. 1180, 131 So. 173; *Renig* v. *Nelson,* 199 Wis. 482, 227 N. W. 14.)

The obligations of sale, delivery and warranty incurred in the case at bar as to 1500 tons of cast-iron scrap obviously related to matters strictly within the scope of the joint venture to sell scrap iron and were reasonably necessary to carry on the venture in furtherance of the common enterprise. In fact, they fulfilled the very purpose for which the venture was created. That these obligations were binding on the respondent corporation and on the respondent copartnership as joint adventurers is irrefutable under the principles above enunciated and under all the equities of the case. The fourth question is therefore answered in the affirmative.

It is no defense to say that the respondent copartnership

was undisclosed or that the respondent corporation purported to sell its own property and the petitioner purchased on that assumption without knowledge of the joint venture, the test being that the sale was within the scope and authority of the joint venture as well as in furtherance of the business in which the joint adventurers were engaged. (See *Proctor* v. *Hearne, supra.*) Neither can the respondent copartnership avoid liability because it had no actual knowledge of the sale at the time it was made, the knowledge of one joint adventurer acting within the scope and authority of the joint venture being the knowledge of all and what would bind the one would bind the others. (See *Robertson* v. *Merwin,* 139 N. Y. S. 726.) Nor can it do so because the respondent corporation secretly pocketed the partial payment of $35,000 on executing the sale and the respondent copartnership received no benefit therefrom, it having the right to share therein upon an accounting with its coadventurer as well as in the final payment of $40,000 on delivery of the entire 1500 tons of cast-iron scrap sold had the contract been fully performed. (See *Driver* v. *Brunemar,* 40 App. Cas. [D. C.] 105; *Selwyn & Co.* v. *Waller,* 142 N. Y. S. 1052; *Reyer* v. *Blaisdell,* 26 Colo. App. 387, 143 Pac. 385; *Perry* v. *Morrison,* 118 Okla. 212, 247 Pac. 1004.)

The written agreement for sale and delivery and supporting bill of sale are thus binding upon the respondent copartnership to the same extent as they are on the respondent corporation, even though respondent corporation may have perpetrated a fraud upon the petitioner and even though the respondent copartnership may be innocent of that fraud. The underlying principle of partnership and principal and agent controls, so that one joint adventurer is liable for the fraud of the other within the scope and authority of the joint venture. Nor are the obligations of sale, delivery and warranty in this case divisible, but in

their entirety are binding obligations upon both parties to the joint enterprise.

The undisputed evidence proves that the respondents corporation and copartnership are in total breach of all the terms of contract. Admittedly, the respondent corporation was insolvent at the time of suit and is now a bankrupt. It never had any intention of complying with any of those terms. Nor did the respondent copartnership ever have any intention of doing so. On the contrary, both respondents, in conjunction with the other respondents as their agents, before and at the time of suit were acting in defraud of the petitioner by intentionally misapplying and converting whatever cast-iron scrap was property of the joint venture and subject to sale by one coadventurer and did so in contravention of the contractual rights and title of the petitioner. Indeed, the cast-iron scrap originally located at Waimea was lost at sea while being so misapplied and converted before suit. The cast-iron scrap at Waianae was likewise handled and was being loaded on a barge by the respondents when restrained at the time of suit. That cast-iron scrap at Waianae would have been a proper subject of equitable relief for injunction and constructive trust in favor of petitioner had not such property been released from the operation of the restraining order, by stipulation of the parties and by a modified restraining order, and sold as a transaction of the joint venture at San Francisco at the rate of $55 per ton, the petitioner filing a bond in the sum of $5000 for costs and damages to the respondents corporation and copartnership, conditioned upon petitioner's failure to sustain its action, and those respondents filing a reciprocal bond signed by the other respondents as agents for them in the sum of $10,000 for costs and damages to the petitioner, conditioned upon its sustaining its action. The bond of those respondents as to damages thus by such mesne proceedings operates in lieu of the equitable

relief for injunction and constructive trust. The next step in logical sequence of equitable relief would be to order the respondents to pay petitioner's damages for which they are jointly and severally liable. The respondents corporation and copartnership come within that liability for their total breach of contract as parties to the joint venture. The respondent Patterson comes within it because he is personally liable for his fraud and for his furtherance thereof by participating in the misapplication and conversion of such property of which he had control as agent and chief administrative officer of the respondent corporation. (See 3 Fletcher *Cyc. Corp.* [perm. ed.] § 1143, p. 727.) The respondent Meagher comes within it because he is likewise liable for his furtherance of that fraud by also participating in the misapplication and conversion of such property as agent and sole representative in the Territory of the respondent copartnership, a foreign copartnership, if not its *alter ego* solely responsible for its breach. (See 3 Fletcher *Cyc. Corp.* [perm. ed.] §§ 1142, 1143, pp. 726, 727; Tiffany on Agency [2d. ed.] § 136, pp. 355, 356, 357.) As already indicated, the undisputed evidence, largely adduced by the respondents themselves, proves the case for the petitioner and conclusively establishes the material allegations of the petitioner's bill.

At this juncture it is proper to consider the contention of the respondents that equity has no jurisdiction to entertain the petitioner's cause and that, therefore, the interlocutory decree, in dismissing the bill and in denying equitable relief, should be sustained. In support of that contention the respondents allege that the presiding judge in equity erred in finding, as he did, (1) that the petitioner has no adequate remedy at law, and (2) that the petitioner is entitled to sue in a territorial court upon the warranty agreement for sale of personal property in the Territory and delivery of that property to California because it con-

stitutes a transaction in interstate commerce, irrespective of the fact that the petitioner is a foreign corporation which otherwise may be doing business in the Territory without complying with statutory requirements for such a corporaion. The first finding is patently a sound one under all the facts and circumstances of this case inclusive of the allegations in the bill itself. Likewise is the second under the principles enunciated by this court in *Cannell & Chaffin* v. *Deering,* 26 Haw. 74. (See *Sioux Remedy Co.* v. *Cope et al.,* 235 U. S. 197; *Mergenthaler Linotype Co.* v. *Spokesman Pub. Co.,* 127 Ore. 196, 270 Pac. 519; *Continental Supply Co.* v. *Hoffman,* 144 S. W. [2d] 253; 17 Fletcher *Cyc. Corp.* [perm. ed.] §§ 8415, 8424, pp. 336, 367.) The contention of the respondents is therefore without merit.

The petitioner's specifications of error presenting the material questions, which have been answered in the affirmative herein, are sustained. Accordingly, the interlocutory decree is reversed and the cause remanded below for further proceedings to determine the nature and extent of the appropriate, just and equitable relief to be granted to the petitioner by a final decree in its favor consistent with this opinion.

*S. Shapiro* (*E. Berman* with him on the briefs) for appellant.

*B. H. Levinson* (*Levinson & Cobb* on the brief) for appellees W. G. Meagher and Industrial Development.

*J. O. Hughes* for Patterson Construction Co., Ltd. (submitted on his brief).